## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

------------------------------------------------------ x
:
ANGELINA P.[1],                                  :          3:24cv00377(RMS)
*Plaintiff,*                                     :
:
V.                                               :
:
LELAND DUDEK, ACTING                             :
COMMISSIONER OF SOCIAL                           :
SECURITY[2],                                     :
*Defendant.*                                     :
:          MARCH 26, 2025
:
------------------------------------------------------ x

## <u>RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>

This is an administrative appeal following the denial of the plaintiff's applications for disability insurance benefits ("DIB") pursuant to Title II of the Social Security Act (the "Act"). It is brought pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The plaintiff now moves for an order reversing the decision of the Commissioner of the Social Security Administration (the "Commissioner"). (Doc. No. 18). In the alternative, the plaintiff seeks an order remanding the case for further administrative proceedings. (*Id.*). The Commissioner, in turn, has moved for an order affirming his decision. (Doc No. 24).

---

[1] To protect the privacy interests of social security litigants while maintaining public access to judicial records, in opinions issued in cases filed pursuant to § 205(g) of the Act, 42 U.S.C. § 405(g), this Court will identify and reference any non-government party solely by first name and last initial. *See* Standing Order – Social Security Cases (D. Conn. Jan. 8, 2021).

[2] When the plaintiff filed this action, she named then-Commissioner of the Social Security Administration, Martin O'Malley, as the defendant. (See Doc. No. 1). On November 29, 2024, O'Malley left the agency. Leland Dudek has since been appointed as Acting Commissioner. As such, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Leland Dudek should be substituted for Martin O'Malley as the defendant in this matter.

For the following reasons, the plaintiff's motion for an order reversing or remanding the ALJ's decision is **DENIED**, and the Commissioner's motion for an order affirming that decision is **GRANTED**.

## I.    PROCEDURAL HISTORY

On January 21, 2021, the plaintiff applied for DIB benefits, claiming that she had been disabled since March 20, 2020, due to fibromyalgia, sleep apnea, myositis, carpal tunnel syndrome, major depressive disorder, generalized anxiety disorder, and obesity.  (Doc. No. 14, Certified Transcript of Administrative Proceedings, dated 5/14/2024 ["Tr."] 81, 267).  The plaintiff's application was denied initially and upon reconsideration.  (Tr. 81–106).  On January 20, 2023, Administrative Law Judge ("ALJ") Matthew Kuperstein held a hearing during which the plaintiff and a vocational expert testified.  (Tr. 33–80).  In April 2023, the ALJ issued an unfavorable decision denying the plaintiff DIB benefits.  (Tr. 14–26).  The Appeals Council denied the plaintiff's request for review in January 2024, thereby making the ALJ's decision the final decision of the Commissioner.  (Tr. 1–3).

The plaintiff filed her complaint in this pending action on March 19, 2024.  (Doc. No. 1). The following month, the parties consented to the jurisdiction of a United States Magistrate Judge, and the case was transferred to the undersigned.  (Doc. No. 12).  On June 27, 2024, the plaintiff filed her Motion to Reverse the Decision of the Commissioner with a memorandum of law.  (Doc. No. 18).  The Commissioner filed his Motion to Affirm and memorandum of law on September 26, 2024.  (Doc. No. 24).  The plaintiff did not file a reply.

## II.    FACTUAL BACKGROUND

The Court presumes the parties' familiarity with the plaintiff's medical history, which is thoroughly discussed in the parties' statements of material facts.  (*See* Doc. No. 18 at 2–18; Doc.

No. 24 at 1).  The Court cites only the portions of the record that are necessary to explain this decision.

### A.    The Plaintiff's Hearing Testimony

On January 20, 2023, the plaintiff appeared for a hearing before the ALJ.  (Tr. 33–79).  Her counsel, Olia Yelner, was present and confirmed that the record was complete.  (Tr. 36).

The ALJ asked the plaintiff to testify about her work history.  She testified that she worked in retail merchandising from 2008 through 2015.  (Tr. 58–60).  In this role, the plaintiff removed products from the shelves and replaced them with new items, causing her to sit, stand, walk, bend, kneel and crouch throughout the day; lift up to 25 pounds; and regularly lift twenty pounds.  (*Id.*).  In 2019, the plaintiff shifted careers to transporting children to and from school, wherein she drove for about 2.5 hours in the morning and 2.5 hours in afternoon with a break in between.  (Tr. 61).  This job did not require her to lift or carry, and she did not supervise people.  (*Id.*).  Her counsel represented that the plaintiff "worked through the duration of her application" with pain and had been performing substantial gainful activity "since the fourth quarter of 2021."  (Tr. 39).  As of the hearing date, she continued to transport children.  (Tr. 42–43, 62).  When the ALJ asked if there is a reason why she could not perform her work, she testified: "I can.  It is just that I have good days and I have bad days."  (Tr. 43).  Despite having bad days along with the good, the plaintiff testified, "I need income to provide and I am just trying to push myself as much as I can."  (Tr. 43).

The ALJ elicited testimony about the plaintiff's physical limitations while working.  The plaintiff testified that she would experience atypical pain when she was "doing the same motion," such as pushing the pedal or holding the steering wheel while driving.  (Tr. 41).  When prompted by counsel, the plaintiff testified she would have pain in her wrist, elbows, shoulders, knee, and

ankles. (Tr. 44). These joints would swell and feel tender, alleviated only by prescription medication and Motrin/ibuprofen. (*Id.*). On a standard day, the plaintiff would experience pain at a level of four out of ten.[3] (*Id.*). The plaintiff testified that she could sit for approximately twenty to 30 minutes but then would need to fidget or get out of the vehicle to stretch for up to five minutes. (Tr. 45–46). After work, the plaintiff would come home and stretch on her bed for twenty minutes; if she did not do so, she would be in pain. (Tr. 46).

As for mental limitations, the plaintiff testified that her "bad anxiety and depression" caused her to feel emotional, overwhelmed, and unfocused. (Tr. 41–42). Examples included her fear of leaving her thirteen year old son in public, struggling to wait in lines or walk around at the grocery store, and talking to strangers. (Tr. 49–50).

Counsel also asked the plaintiff to testify about her ability to complete household tasks. (Tr. 47). She testified that she could stand at the sink for approximately five minutes before she needed to stretch her back. (*Id.*). She also had to take regular five-minute breaks if she was chopping vegetables and doing the dishes. Without breaks, the plaintiff would drop objects and her hands would cramp and swell. (Tr. 48). For tasks involving larger objects like the laundry or grocery shopping, the plaintiff required her son's help or, with respect to groceries, she would have to leave non-refrigerated heavier items in the car while she brought lighter groceries into her home. (Tr. 49).

B.    **The Vocational Expert's Testimony**

The vocational expert, Esperanza Distefano, first testified that the plaintiff's past jobs are identified as merchandise clerk and shuttle driver. (Tr. 62–63). Merchandise clerk is considered semi-skilled and requires heavy exertion, but the vocational expert testified the plaintiff performed

---

[3] On this zero to ten scale, a zero is no pain and a ten is "pain so bad you are crying." (Tr. 44).

it at a light exertion level.  (*Id.*).  Shuttle driver is a semi-skilled, medium exertion job, which the plaintiff performed at that level and which required "constant reaching and handling."  (Tr. 63).

The ALJ presented several hypotheticals and asked the vocational expert to opine about the possible substantial gainful activity with the following assumptions: the hypothetical person would be between 38 and 41 years-old, would have completed the tenth grade, and would have the same past work experience as the plaintiff.[4]

First, the ALJ asked the vocational expert to testify about available jobs if the hypothetical person had limitations of (1) lifting, carrying, pushing, or pulling 25 pounds frequently and 50 pounds occasionally; (2) standing, walking, and/or sitting with normal breaks for six out of eight hours in a work day; (3) performing work that involves "understanding, remembering or carrying out . . . simple and repetitive tasks and instructions that do[ ] not require a specific production rate;" and (4) performing work with only "occasional changes in a routine work setting where there is only occasional interaction with the general public."  (Tr. 64–65).  The vocational expert testified that a person with these limitations could perform the jobs of hand packer, hand launderer, and salvage laborer.  (Tr. 65).  All of these jobs are classified as unskilled, medium exertion positions.  (*Id.*).

Second, the ALJ presented hypotheticals with additional restrictions, but the vocational expert concluded such a person could still perform the jobs of hand packer, hand launderer, and salvage laborer.  The restrictions included: hazards, such as proximity to moving mechanical parts and exposure to high places, electrical shock, radiation, and explosives (Tr. 66); or no interaction

---

[4] The ALJ asked the plaintiff to testify about myriad hypotheticals, but the Court will discuss only those that apply to the ALJ's determination about the plaintiff's  residual functional capacity.

with the general public (Tr. 67).  The vocational expert also testified that an individual could still perform these roles if any of the above "occasional" restrictions were entirely restricted.  (Tr. 68).

The ALJ continued to present hypotheticals that are not relevant here.  Ultimately, the ALJ presented the following hypothetical: (1) lifting, carrying, pushing, or pulling ten pounds frequently and twenty pounds occasionally; (2) "standing or walking with normal breaks for a total of four hours in an eight hour work day;" (3) sitting with normal breaks for a total of six hours in an eight hour work day;" (4) performing work that involves "understanding, remembering or carrying out simple and repetitive tasks or instructions . . . which do[ ] not require a specific production rate such as assembly line work or even hourly quotas" and do not have changes in the work routine; (5) "only occasional interaction with coworkers or supervisors and no interaction with the general public;" (6) no exposure to vibration or hazards such as proximity to moving mechanical parts,   electrical shock, exposed places, radiation or explosives; and (7) climbing ramps or stairs, balancing, stooping, kneeling, crouching or crawling occasionally; (8) never climbing ladders, ropes, or scaffolds; and (9) "work that does not require the use of foot controls with the right lower extremity."  (Tr. 72–73).  The vocational expert testified that an individual with these limitations could perform the job of surveillance system monitor—of which there are 2,700 jobs nationally—as long as the exertion was limited to the sedentary level.  (Tr. 73).  Without a sedentary exertion limitation, the individual could not work.  (Tr. 73–74).

The vocational expert also testified about an individual's ability to be off-task.  (Tr. 76). She stated that an employer would tolerate off-task behavior for ten percent of the workday, but not twenty percent, and that only half of employers would tolerate off-task behavior for fifteen percent of the workday.  (*Id.*).

C.    **Medical Evidence**

While the record contains evidence dating as far back as 2014, the ALJ focused on medical records ranging from July 2019 through July 2022.  Neither party objected to this date range even though it spanned beyond the onset date of March 20, 2020, and the substantial gainful activity date of October 1, 2021.  For purposes of this appeal and consistent with the ALJ's consideration, the Court will consider the medical evidence from the period between June 2019 through July 2022.

The medical records contain evidence from several providers: New Haven Rheumatology, P.C. for her fibromyalgia (Tr. 527–607, 984–87, 1215–1235 (B2F, B3F, B11F, B18F)); Southwest Community Health Center for mental health treatment, lab testing, fatty liver, pain and other primary care issues (Tr. 719–792, 797–876, 894–983, 1082–1214, 1321–1530, 1678–1851 (B6F, B8F, B10F, B16F, B17F, B20F, B21F, B24F, B25F)); Gastroenterology Associates of Fairfield County, P.C. for chronic gastric issues, including pain (Tr. 520–26, 1853–57 (B1F, B26F)); Stephen Breda, M.D. F.A.C.S. for ear, nose and throat issues (Tr. 880–93, 988–999, 1081 (B9F, B12F, B15F)); Adrian Klufas, M.D. for unspecified issues (Tr. 1000–24); and Yale New Haven Health for emergency department visits, sleep studies, lab testing, imaging, and occupational therapy (Tr. 540–718, 793–96, 1025–80, 1236–1320, 1531–1677 (B4F, B5F, B7F, B14F, B19F, B22F, B23F)).

The ALJ determined the plaintiff had four severe impairments: fibromyalgia, anxiety, depression, and obesity.  (Tr. 17).  In addition, the ALJ determined the plaintiff's back pain, myositis, foot numbness, chest pain, and abdominal pain were symptoms of her fibromyalgia.  (*Id.* at 18).  Lastly, the ALJ determined the plaintiff's diagnoses of obstructive sleep apnea, bilateral carpal tunnel syndrome, generalized headaches, cervical strain, and fatty liver were not severe

impairments.  (*Id.* at 17).  Only her impairments of fibromyalgia, anxiety, and depression are relevant to this appeal.

### 1.    Fibromyalgia

In September 2017, the plaintiff was diagnosed with fibromyalgia.  (Tr. 553).  During the relevant period, the plaintiff visited her rheumatologist on July 18, 2019 (Tr. 547); January 16, March 30, May 11, and August 12, 2020 (Tr. 540–46); April 7 and May 14, 2021 (Tr. 1215–16, 1219); and January 14, 2022 (Tr. 1217).[5]  The records indicate her symptoms were generally "well managed" through medication.  (Tr. 540–47, 1215–16, 1219).  Specifically, she generally took 60 mg of Cymbalta per day and cyclobenzaprine to "settle her overall pain and discomfort" during acute flares, which happened "rarely."  (Tr. 540–47).  The plaintiff consistently denied pulmonary symptoms, chest pain or pressure, gastrointestinal symptoms, genitourinary symptoms, and skin lesions or rashes. (Tr. 540–47, 1215–16, 1219).

The plaintiff's mother passed away from metastatic cancer on May 27, 2020.  (Tr. 527).  Stress surrounding her mother's illness and passing caused the plaintiff's overall pain to aggravate.  (Tr. 527–30).  When the plaintiff struggled to consistently take her medication shortly after her mother passed away, her pain became "more pronounced," causing "achiness in her hands and wrists" and "intermittent muscle cramps and spasms."  (Tr. 540 (8/12/20)).  Even a year later, the plaintiff's pain exacerbated when she was under stress, resulting in hand discomfort, leg pain, difficulty catching her breath, and gastric discomfort.  (Tr. 1215 (5/14/21)).  Weight gain also contributed to increased pain.  (Tr. 1219).

Apart from the rheumatologist, the plaintiff sought treatment from other providers during the relevant period for various symptoms, which the ALJ determined were associated with

---

[5] With respect to physical symptoms, the ALJ cited evidence ranging from July 2019 through June 2022, and the plaintiff did not appeal his decision to assess this time period.  (Tr. 17, 21).

fibromyalgia. (Tr. 18). Such symptoms included chest pain, foot numbness and pain, abdominal pain, and weakness.[6] (*See, e.g.,* Tr. 632, 754, 1161, 1556–57).

### 2. Anxiety and Depression

The plaintiff was diagnosed with major depressive disorder and anxiety prior to her onset date. (Tr. 894, 909). Throughout the relevant time period, the plaintiff treated her mental health conditions with psychotherapy and medication management.[7] (Tr. 894, 902, 909, 921, 929, 935, 942, 948, 954, 960, 966, 1438, 1450, 1461, 1473, 1486, 1497, 1508, 1520, 1678, 1690, 1701, 1712, 1723).

The first psychotherapy appointment during the relevant period took place on April 20, 2020. (Tr. 910). The plaintiff shared that the COVID-19 pandemic increased her anxiety and made her "unable to sleep." (*Id.*). She indicated she was "feeling stable but not taking her medications regularly" and added that her "symptoms are controlled on her current medications."[8] (*Id.*).

In May and June 2020, the plaintiff received mental health treatment on a bi-weekly basis. On May 11, 2020, the plaintiff shared that her mother, who had lung cancer, was given months to live. (Tr. 922). She was tearful and reported feeling depressed and anxious, with more frequent anxiety attacks. (*Id.*). Her provider changed her medication to treat her panic attacks. (*Id.*). Ten

---

[6] The plaintiff summarized the cited appointments in her Statement of Facts. (Doc. No. 18-1 at 5–10 (¶¶ 12, 16, 29, 35)). These appointments included two visits to her primary care provider on July 2, 2020 and May 18, 2021; a visit to Yale New Haven Health on November 23, 2020; and an emergency room visit on June 22, 2021.

[7] The ALJ referred to psychological records from April 20, 2020, through January 20, 2022. (Tr. 21–22 (citing B10F at 16, B24F at 36). Specifically, the plaintiff received treatment on April 20, May 11, May 21, June 1, June 22, August 17 and November 19, 2020; January 7, February 11, June 3, July 15, July 29, August 18, September 3, September 29, September 30, October 20, November 11, December 3, December 28, 2021; and January 20, 2022. The plaintiff does not appeal the ALJ's date range.

[8] On March 30, 2020, the plaintiff's rheumatologist noted that she "has had some increasing anxiety and panic attacks" and was "managing these symptoms with conservative measures." (Tr. 544).

days later, the plaintiff presented as "calm and was not tearful." (Tr. 929). She explained that her medication improved her symptoms and she "has been feeling better and adjusting well to the news of her mother's illness and prognosis." (*Id.*). By the end of May 2020, the plaintiff's mother passed away. (Tr. 935). On June 1, 2020, she received grief counseling and brief supportive therapy. (*Id.*). By June 22, 2020, the plaintiff was "pleasant and productive, appeared to be in good spirits and had no complaints." (Tr. 942).

Following her mother's passing, the plaintiff's mental health vacillated. For example, on August 17, 2020, the plaintiff was "tearful," had difficulty experiencing pleasure, and suffered from overthinking and anxiety. (Tr. 948). Nonetheless, she felt her medication controlled her symptoms. (Tr. 949). Her symptoms were less intense at her next appointment on November 19, 2020, as the plaintiff reported feeling "okay," and "just taking it day by day." (Tr. 954). Yet on January 7, 2021, she was again tearful, anxious, struggled to feel pleasure, and suffered from "several psychosocial stressors including unemployment, financial difficulties, family problems and anxiety around the ongoing COVID." (Tr. 961). Within this general range of symptoms, the plaintiff continued to experience "up and down" mental health for the remainder of 2021. (*See supra*, at 9 n.6). On two occasions in September 2021, the plaintiff described her anxiety as a four out of five. (Tr. 1487, 1498).

The record also contains mental health treatment after the substantial gainful activity date. (Tr. 1678, 1690, 1701, 1712, 1723). On November 11, 2021, the plaintiff described "feeling sad especially since this fall when it started getting dark early." (Tr. 1678). In early December, the plaintiff reported improved mood and noted, "I feel more motivated, I joined the gym." (Tr. 1690). While still experiencing some anxiety, she indicated she was "taking medications and following [her] psychiatric provider's recommendations." (Tr. 1691). The provider described her as "alert

and oriented x 3" and "open to feedback." (Tr. 1691). At the end of December, the plaintiff reported "no significant change," although she cried when talking about how her son and boyfriend do not appreciate her housework. (Tr. 1702). On January 20, 2022, the plaintiff reported feeling overwhelmed by the house chores and dismissed by her boyfriend and son. (Tr. 1713). She also reported "concerns about her medical issues and how they affect her mood," adding that she could not exercise due to pain. (*Id.*). The following week (the last therapy visit in the record), the plaintiff felt "in good spirits, related well and denied any problems." (Tr. 1723).

From the onset date to the date of substantial gainful activity, the plaintiff denied suicidal ideation, homicidal ideation, auditory hallucination, and visual hallucination. (Tr. 903, 910, 922, 929, 936, 942, 949, 955, 961, 967, 1439, 1453, 1461, 1477, 1489, 1500, 1508).

### D.    Medical Opinions

Four State agency consultants evaluated the plaintiff's medical records. At the initial stage, Maryann Wharry, Psy.D., evaluated the plaintiff's mental impairments, and Rafael Olivares, M.D. evaluated her physical impairments. (Tr. 85–94). At the reconsideration stage, Warren Leib, Ph.D., evaluated the plaintiff's mental impairments and David Gillum, M.D., evaluated her physical impairments. (Tr. 96–106).

### 1.    Initial Stage

Dr. Wharry considered the plaintiff's mental health at the initial stage. She assessed and summarized therapy notes from May 29 and June 27, 2019; April 20, May 11, June 1, August 17, and November 19, 2020; and January 7 and February 11, 2021.[9] (Tr. 88). Throughout this time, the plaintiff denied suicidal ideation and homicidal ideation. (*Id.*). Dr. Wharry noted, however,

---

[9] Based on Dr. Wharry's summary of the evidence, the following medical records appear to have been missing from his record: appointments from May 21, 2020 and June 22, 2020 as well as all 2021 appointments after February 11, 2021.

that the plaintiff's symptoms fluctuated in severity, in part due to inconsistent medication use, the COVID-19 pandemic, and the death of her mother.  (Tr. 89).

With respect to the residual functional capacity ("RFC"), Dr. Wharry concluded that the plaintiff did not have any limitations with (1) understanding and memory and (2) adaption, but she did have limitations with (3) sustained concentration and persistence and (4) social interaction. Specifically, Dr. Wharry found that the plaintiff was "moderately limited" in her ability to "respond appropriately to changes in the work setting," "carry out detailed instruction," and "maintain attention and concentration for extended periods" but that she was "not significantly limited" in all other metrics.[10]  (Tr. 91–92).  She concluded:

> Symptoms are partially consistent with allegations as MDIs are established but [activities of daily living] and objective findings do not suggest claimant is precluded from all work. While symptoms do adversely impact ability persist in some work settings, alleged severity is not supported.  Claimant is able to persist at tasks that can be learned in up to six months on the job.

(*Id.*).  She also noted that the plaintiff was "able to manage a range of routine tasks and social contact," and she "reported no difficulty getting along with others."  (Tr. 89).

Also at the initial stage, Dr. Olivares evaluated the plaintiff's physical limitations.  With respect to her fibromyalgia, Dr. Olivares summarized her appointments from July 18, 2019, as well as March 30, August 12, and December 28, 2020, noting symptoms of muscle spasms and

---

[10] Dr. Wharry determined the plaintiff was "not significantly limited" as to the following abilities: "carry out very short and simple instructions;" "perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;" "sustain an ordinary routine without special supervision;" "make simple work-related decisions;" "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;" "be aware of normal hazards and take appropriate precautions;" "travel in unfamiliar places or use public transportation;" and "set realistic goals or make plans independently of others."  (*Id.*).

cramps, which increased with stress and inconsistent use of medication.[11]  (Tr. 91).  Dr. Olivares found that the plaintiff had an exertional limitation to frequently lift twenty pounds but only occasionally lift 50 pounds, and that she could only stand or sit for six hours in an eight-hour day. (Tr. 90).  He did not observe any other physical limitations.  (Tr. 90–91).

### 2.    Reconsideration Stage

At the reconsideration stage, Drs. Leib and Gillum evaluated the same exact mental health and fibromyalgia evidence as the initial stage State agency consultants.  (*See* Tr. 86–88, 97–99).

Dr. Leib concluded the plaintiff had more RFC limitations than what was described by Dr. Wharry.  For the general categories, Dr. Leib concluded the plaintiff did not have adaption limitations, but she was limited in understanding and memory, sustained concentration and persistence, and social interaction.  (Tr. 103–04).  Specifically, he concluded the plaintiff was "moderately limited" in all categories identified by Dr. Wharry.  (*Id.*).  But he also found the plaintiff was moderately limited in the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods" and "interact appropriately with the general public." (*Id.*).  Dr. Leib finished his assessment with two observations: (1) that the plaintiff was "[a]nxious and depressed but can relate adequately for the purpose of completing simple tasks in a low demand setting;" and (2) that she had "[p]oor coping skills and [was] best suited for structured work with infrequent changes."  (Tr. 104).

Dr. Gillum's assessment at the reconsideration stage is virtually identical to Dr. Olivares' initial stage assessment.  He added that the plaintiff's rheumatology records indicate she "had no evidence of synovitis of any joints, and she was noted to have scattered trigger points."  (Tr. 103).

---

[11] Based on Dr. Olivares' summary of the evidence, it appears that his record was missing rheumatology appointments from January 16, 2020; May 11, 2020; April 7, 2021; and May 14, 2021.

He concluded, "Overall, the evidence supports this RFC," *i.e.* the limitations identified by Dr. Olivares. (Tr. 103).

## III.    **THE ALJ'S DECISION**

The ALJ must follow a five-step evaluation process as promulgated by the Commissioner to determine whether a claimant is disabled within the meaning of the Act. *See* 20 C.F.R. § 404.1520(a).[12]   In this case, the ALJ determined that the plaintiff met the insured status requirements under the Act through December 31, 2026. (Tr. 14, 16). At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity from her alleged onset date of March 20, 2020 through September 30, 2021, a period exceeding the twelve-month statutory requirement.[13] (Tr. 16).

At step two, the ALJ determined that the plaintiff had the following severe impairments: fibromyalgia, obesity, depressive disorder, and anxiety disorder (Tr. 17).

---

[12] An ALJ determines a claimant's disability using a five-step analysis. *See* 20 C.F.R. § 404.1520. First, an ALJ must determine whether a claimant is currently working. *See* 20 C.F.R. § 404.1520(a)(4)(i). If a claimant is currently employed, then the claim is denied. *Id*. If a claimant is not working, then an ALJ must make a finding as to the existence of a severe mental or physical impairment. If none exists, then the claim is also denied. *See* 20 C.F.R. § 404.1520(a)(4)(ii). If a claimant is found to have a severe impairment, then the third step is to compare the claimant's impairment with those in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the Regulations ("the Listings"). *See* 20 C.F.R. § 404.1520(a)(4)(iii); *Bowen v. Yuckert*, 482 U.S. 137, 141 (1987); *Balsamo v. Chater*, 142 F.3d 75, 79–80 (2d Cir. 1998). If a claimant's impairment meets or equals one of the impairments in the Listings, then the claimant is automatically considered disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii); *see also Balsamo*, 142 F.3d at 80. If a claimant's impairment does not meet or equal one of the listed impairments, then the claimant must show at the fourth step that she cannot perform her former work. *See* 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant shows that she cannot perform her former work, then the burden shifts to the Commissioner to show at step five that the claimant can perform other gainful work. *See Balsamo*, 142 F.3d at 80 (citations omitted). Accordingly, a claimant is entitled to receive disability benefits only if she shows that she cannot perform her former employment, and the Commissioner fails to show that the claimant can perform alternate gainful employment. *See* 20 C.F.R. § 404.1520(a)(4)(v); *see also Balsamo*, 142 F.3d at 80 (citations omitted).

[13] The ALJ found the plaintiff performed substantial gainful activity from October 1, 2021 onward. (Tr. 16). The plaintiff does not appeal this finding.

At step three, the ALJ found that the plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18).  In doing so, the ALJ considered her fibromyalgia under SSR 12-2p, obesity under SSR 19-2p, and anxiety and depression under paragraphs B and C of listings 12.04 and 12.06.  *See* 20 C.F.R. part 404, Subpart P, Appendix 1.

Next, the ALJ formulated the plaintiff's RFC.  A plaintiff's RFC is the most they can do despite their impairments and is determined by assessing all the relevant evidence.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ determined the plaintiff had the RFC to perform "medium work as defined in 20 CFR 404.1567(c)" with the following exceptions:

> she is further limited to: lifting, carrying, pushing, or pulling 50 pounds occasionally and 20 pounds frequently; standing or walking with normal breaks for a total of six hours in an eight hour workday; sitting with normal breaks for a total of six hours in an eight hour workday; work that involves only understanding, remembering, or carrying out work involving simple and repetitive tasks or instructions; and has no more than occasional changes in a routine work setting.

(Tr. 19–20).

At step four, based on the testimony of the vocational expert, the ALJ found that the plaintiff could not perform her past relevant work.  (Tr. 23).  Moving on to step five, the ALJ concluded the plaintiff could perform other jobs in the national economy, such as marker, router, assembler of small products, surveillance system monitor, usher, photofinishing counter clerk, and furniture rental consultant.  (Tr. 25).  Given this finding, the ALJ found that plaintiff was not disabled from her alleged onset date to September 30, 2021.  (*Id.*).

## IV.   <u>STANDARD OF REVIEW</u>

"A district court reviewing a final . . . decision [of the Commissioner of Social Security] pursuant to section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), is performing an appellate function."  *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981).  The Court's

function is to first ascertain whether the ALJ applied the correct legal principles in reaching their conclusion, and then whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive[.]" 42 U.S.C. § 405(g). *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). Substantial evidence means more than a scintilla, "[i]t means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 400 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 229 (1938)). Therefore, absent legal error, this court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). "Such a deferential standard, however, is not applied to the Commissioner's conclusions of law." *Muntz v. Astrue*, 540 F. Supp. 2d 411, 418 (W.D.N.Y. Mar. 17, 2008) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). "This court must independently determine if the Commissioner's decision applied the correct legal standards in determining that the plaintiff was not disabled." *Id.* "Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986.

V.    **DISCUSSION**

The plaintiff's raises two arguments in this appeal: (1) the ALJ improperly substituted his judgment for the opinions of the State agency medical and psychological consultants, (Tr. 20–24); and (2) the ALJ's RFC determination did not properly consider the plaintiff's limitations and is

16

not supported by substantial evidence, (Tr. 24–26). The Commissioner disagrees with both arguments, explaining that the ALJ properly evaluated the State agency consultants under the factors articulated in 20 C.F.R. § 404.1520c(c)(1)-(5) and that substantial evidence supports the RFC determination. (Tr. 3–12). For the following reasons, the Court finds the ALJ did not commit reversible error, and the Commissioner's decision is AFFIRMED.

A.      **The ALJ's Assessment Of The State Agency Consultants**

In arguing that the ALJ improperly substituted his own opinion for that of the State agency consultants, the plaintiff separately addresses the State agency psychological consultants and medical consultants. The Court will do so as well for the purpose of clarity.

1.      **State Agency Psychological Consultants**

Starting with the ALJ's assessment of the State agency psychological consultants, the plaintiff argues the ALJ erred for three reasons. First, she states that the ALJ improperly focused on her work history in 2020 even though she did not perform substantial gainful activity during that time. (Doc. No. 18-1 at 21). Second, she claims that the ALJ failed to explain the requisite five factors under § 404.1520c of the Code of Federal Regulations. (*Id.* at 22). Third, she contends the "longitudinal record" supports a finding of greater psychological limitation than the ALJ assigned. (*Id.*).

The defendant disagrees. With respect to work activity, the defendant argues the ALJ reasonably considered the evidence that she worked as a shuttle driver in 2020. While the defendant concedes that the plaintiff did not engage in substantial gainful activity between March 20, 2020, and October 1, 2021, it posits that the plaintiff's testimony establishes "she performed the job the same way both when she was engaged in SGA and when she was not, explaining that beginning in late 2021 her employer was short staffed, so she took on extra work when it became

available because she was not earning enough money." (Doc. No. 24-1 at 6–7). As for the five §

404.1520c factors, the defendant summarizes the regulation, the consultants' opinions, and the

ALJ's findings about each consultants' persuasiveness but does not explicitly address whether the

findings adequately address the "supportability" and "consistency" factors. (*Id.* at 4, 6). Instead,

the defendant states both that the ALJ found this opinion evidence to be persuasive based on the

fact that the ALJ's RFC is based on the limitations suggested by these opinions, and that, regardless

of whether the ALJ sufficiently discussed the § 404.1520c factors, substantial evidence supports

the ALJ's ultimate conclusion. (*Id.* at 5, 7).

The Court first addresses the plaintiff's argument that the ALJ failed to consider the five

factors under § 404.1520c(3)(c). Section 404.1520c sets forth the parameters an ALJ must follow

when evaluating the persuasiveness of a medical opinion or prior administrative medical finding.

The Commissioner "will not defer or give any specific evidentiary weight, including controlling

weight, to any medical opinion(s) or prior administrative medical finding(s), including those from

your medical sources." 20 C.F.R. § 404.1520c(a). Instead, the ALJ evaluates the prior

administrative medical findings by applying the five factors listed in 20 C.F.R. §§ 404.1520c(c)(1)-

(5), which are (1) supportability, (2) consistency, (3) relationship with the claimant, (4)

specialization, and (5) any other factors. *Id.*

Of these factors, supportability and consistency are the most important, and an ALJ must

explicitly articulate how he considered them. *See* 20 C.F.R. § 404.1520c(b)(2). When considering

"supportability," an ALJ is expected to look to "the objective medical evidence and supporting

explanations presented by a medical source . . . to support his or her medical opinion(s) or prior

administrative medical finding(s)." 20 C.F.R. § 404.1520c(c)(1). The "consistency" factor relates

to a prior administrative finding's consistency with other evidence in the record. "The more

consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2). An ALJ may explain how he considered the other three factors, but he is not required to do so. *See* 20 C.F.R. § 404.1520c(b)(2).

As a brief background, on March 27, 2017, § 404.1520c took effect, replacing § 404.1527, its predecessor medical evidence rule known as the "treating physician rule." The revisions included, in relevant part, "redefining several key terms related to evidence" and "revising how we consider and articulate our consideration of medical opinions and prior administrative medical findings." Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5844 (Jan. 18, 2017) (hereinafter "Revisions Medical Evidence Rules"). The purpose of the revisions was to "simplify our rules to make them easier to understand and apply, and allow us to continue to make accurate and consistent disability determinations and decisions." *Id.*

One of the key changes was that, under § 404.1520c, the ALJ would be required to "articulate" the persuasiveness of each medical opinion and prior administrative finding. 20 C.F.R. § 404.1520c(b). When promulgating the rules that would become § 404.1520c, the Social Security Administration explained the meaning of "articulation":

> We also revised final 404.1520c(a)-(b) and 416.920c(a)-(b) to clarify that there is a difference between considering evidence and articulating how we consider evidence. We consider all evidence we receive, but we have a reasonable articulation standard for determinations and decisions that does not require written analysis about how we considered each piece of evidence.
>
> We expect that the articulation requirements in these final rules will allow a subsequent reviewer or a reviewing court to trace the path of an adjudicator's reasoning, and will not impede a reviewer's ability to review a determination or decision, or a court's ability to review our final decision.

Revisions Medical Evidence Rules, 82 Fed. Reg. at 5857.

As the Second Circuit made clear, a reasonable articulation *must explain* the ALJ's thought process, i.e. *how* he considered the evidence. *See Rubin v. Martin O'Malley, Comm'r of Soc. Sec.*, 116 F.4th 145, 154 (2d Cir. 2024) ("The explicit language of that regulation requires that an ALJ consider and articulate 'how persuasive the SSA finds all of the medical opinions and all of the prior administrative medical findings in the claimant's case record.'" (quoting 20 C.F.R. § 404.1520c(b)) (internal alterations removed); *see also Raymond v. Comm'r of Soc. Sec.*, No. 5:19-CV-1313 (ATB), 2021 WL 706645, at *8 (N.D.N.Y. Feb. 22, 2021) ("At their most basic, the amended regulations require that the ALJ explain her findings regarding the supportability and consistency for each of the medical opinions, pointing to specific evidence in the record supporting those findings.") (internal quotations marks omitted).

The Second Circuit held in a summary order that an ALJ "commit[s] procedural error by failing to explain how it considered the supportability and consistency of medical opinions in the record." *Loucks v. Kijakazi*, No. 21-1749, 2022 WL 2189293, at *2 (2d Cir. June 17, 2022). The *Loucks* Court reversed the district court's judgment affirming the ALJ on the grounds that the ALJ failed to adequately articulate "supportability" and "consistency" for two medical sources. Specifically, the ALJ found one medical source persuasive but "did not address the opinion's supportability or explain how the opinion was consistent with the record, except to conclude that it was." *Id.* For another medical source, the ALJ failed to address consistency "except to say that 'it [was] inconsistent with the evidence of record during the relevant period." *Id.* These failures, the Second Circuit concluded, constituted procedural error. *Id.*

Here, the ALJ's findings are similarly conclusory. In addressing the State agency psychological consultants' opinions, the ALJ never cited any evidence or otherwise meaningfully engaged with the record.[14] (Tr. 22–23).

Specifically, at the initial level, the ALJ found Dr. Wharry "somewhat persuasive," stating in conclusory fashion that her RFC limitations "are generally supported by the related internal analyses in arriving at these opinions" and that the limitations "have remained generally consistent with the objective medical evidence of record when they were made and even the objective medica[l] evidence that was added into the record at the administrative hearing level." (Tr. 23).[15] Not only did the ALJ fail to refer to or cite any evidence, but he also failed to explain what aspects of Dr. Wharry's findings were not persuasive. He noted only that the plaintiff had been able to work as a bus driver since February 2020.

At the reconsideration level, the ALJ found Dr. Leib—whose assessment was similar to Dr. Wharry's but added a moderate limitation in "interacting with others"—to be less persuasive. (Tr. 23). Specifically, the ALJ disagreed with Dr. Leib's assessment of the Part B Criteria of the Listings, as follows:

> The undersigned deviates from this psychologist's full assessment at the reconsideration level in finding that the claimant does not have a moderate limitation in social interactions, as evidenced by her ongoing work activity as a school bus driver since February 2020, and no mental status examinations showing deficits in behavior or speech.

(*Id.*).

---

[14] The only aspect of the record the ALJ cited were the Disability Determination Explanations at the initial and reconsideration stages, i.e. only the State agency consultants' opinions themselves.

[15] The Court notes that the plaintiff does not explicitly object to the ALJ's assessment of Dr. Wharry. However, for the purposes of addressing the plaintiff's argument that the ALJ did not adequately address the "supportability" and "consistency" factors, the Court also analyzes the ALJ's consideration of Dr. Wharry's medical opinion.

The ALJ did not explain why Dr. Leib's opinion was not supported by his other findings, nor did the ALJ reference any objective medical evidence in the record.  Moreover, the ALJ did not explain why the plaintiff's ability to drive children part-time precluded her from having "moderate limitation in social interactions," even absent behavior or speech deficits.  The ALJ's reference to the plaintiff's February 2020 work activity is not sufficient to satisfy the "articulation" standard because it is irrelevant to "supportability," does not constitute objective medical evidence for the purposes of considering "consistency," and does not otherwise enable the Court to "trace the path of an adjudicator's decision."  Revisions Medical Evidence Rules, 82 Fed. Reg. at 5857.

Because the ALJ did not articulate *why* the State agency consultants were "somewhat persuasive" and "less persuasive," his failure constitutes procedural error.  Procedural error generally warrants "remand with instructions to reconsider the disability claim consistent with the procedural mandates of the governing regulations."  *Loucks*, 2022 WL 2189293, at *3 (citation omitted).  Where an ALJ fails to explain "supportability" and "consistency," lower courts have held that remand may be required when the ALJ does not "both identify evidence that supports his conclusion and build an accurate and logical bridge from the evidence to [his] conclusion to enable meaningful review."  *Gina B. v. Comm'r of Soc. Sec.*, No. 3:23-CV-00769-RAR, 2024 WL 4262640, at *6 (D. Conn. Sept. 23, 2024) (internal quotation marks removed) (citing cases).  "Remand is unnecessary, however, where application of the correct legal standard could lead to only one conclusion."  *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (internal citations and alterations omitted) (quoting *Johnson*, 817 F.2d at 986).  Put another way, a court may affirm if the procedural error is harmless.  *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022).

The Court concludes the error was harmless.  As an initial matter, both State agency psychological consultants found that the plaintiff could work notwithstanding her limitations.  (Tr.

92, 103–04). Dr. Leib, who assigned more "moderate limitations" to the plaintiff than Dr. Wharry, opined: "[c]an remember and understand simple instructions," "[l]ow CPP tolerance but retains ability for RRT and can maintain attention necessary to complete simple tasks in a low demand environment," "[a]nxious and depressed but can relate adequately for the purpose of completing simple tasks in a low demand setting," and "[p]oor coping skills and best suited for structured work with infrequent changes." (Tr. 103–04). The AJL incorporated all of these opinions into his RFC by limiting the plaintiff to (1) "only understanding, remembering, or carrying out work involving simple and repetitive tasks or instructions;" and (2) "no more than occasional changes in a routine work setting." (Tr. 19–20). In other words, by limiting the plaintiff to "simple and repetitive tasks and instruction," and routine work with only occasional changes, the ALJ, despite his determination about the persuasiveness of their opinions, adequately accounted for the limitations recommended by Drs. Wharry and Leib, the only medical experts who opined about the plaintiffs' psychological limitations. *See Schillo*, 31 F.4th at 77 ("As the ALJ accorded the treating physicians' opinions *lesser* and not *no* weight, she still considered their conclusions to assess Schillo's RFC."). In summary, the ALJ's failure to adequately explain "supportability" and "consistency" is harmless because all of the medical source opinions and prior administrative findings reach the same conclusion: the plaintiff could work as long as she was restricted to simple and repetitive tasks and instructions with only occasional changes to her routine.

Moreover, the objective medical evidence similarly establishes that the procedural error was harmless. As previously summarized in Part II Section C, the plaintiff received medication management and psychotherapy treatment six times between April and August 2020, once in November 2020, twice in early 2021, eleven times in the second half of 2021, and twice in January 2022. (Tr. 909, 921, 929, 935, 942, 948, 954, 960, 966, 1438, 1450, 1461, 1473, 1486, 1497, 1508,

1520, 1678, 1690, 1701, 1712, 1723).  The overwhelming majority of these visits indicate that the plaintiff's symptoms were controlled through medication, that she was stable, and that she was not in acute distress.  (*See, e.g.,* Tr. 909–910, 929, 942, 955, 1438, 1451, 1461, 1508, 1691, 1723). The plaintiff's most severe symptoms—such as tearfulness, panic attacks, or atypical sadness— coincided with specific events, such as grief over her mother's illness and passing in mid-2020, (Tr. 922, 935, 948); memories about her mother in winter 2021 (Tr. 961, 967); fear of COVID-19 exposure when school restarted in September 2021 (Tr. 1487); and fear about carpal tunnel surgery in September 2021 (Tr. 1498).[16]  In each of these instances, the plaintiff exhibited improvement shortly after the exacerbating issue.

Though the ALJ failed to cite to the medical evidence when he evaluated the persuasiveness of State agency consultants' opinions as to the plaintiff's psychological limitations, the ALJ did thoroughly summarize the medical evidence regarding the plaintiff's related mental impairments in the same section of his decision.  (*See* Tr. 22–23).  Based on the ALJ's citation and extensive summary of this evidence and his incorporation of the psychological consultants' opinions into his RFC, the Court finds that the ALJ adequately "identif[ied] evidence that supports his conclusion" and sufficiently built an "accurate and logical bridge" connecting the evidence to his conclusion such that the Court can perform a "meaningful review."  *Gina B.*, 2024 WL 4262640, at *6.

### 2.    State Agency Medical Consultants

Turning to the ALJ's assessment of the State agency medical consultants, the parties disagree about whether the ALJ's "medium work" restriction constitutes reversible error.  The plaintiff argues that the ALJ reversibly erred, because he assigned the plaintiff "medium work

---

[16] One of the plaintiff's greatest stressors seemed to be lack of family support at home.  (See, e.g., Tr. 1474, 1498, 1521, 1702, 1713).

exertion" with a twenty-pound frequent weight restriction, rather than assigning her "light work exertion" as the State agency consultants recommended.  (Doc. No. 18-1 at 23).  She points to evidence that she believes establishes a "higher level of physical impairment than the ALJ determined."  (*Id.* at 24).  The defendant contends that the ALJ accounted for the plaintiff's inability to lift more than twenty pounds frequently by assigning her a twenty-pound lifting limitation in addition to the "medium work" assignment.  (Doc. No. 24-1 at 8).  In addition, the defendant maintains that substantial evidence supports the ALJ's findings.

"The regulations establish ranges of physical exertion (sedentary, light, medium, heavy, and very heavy) that are bounded by a lower weight the claimant must be able to lift and carry frequently and a maximum weight the claimant must be able to lift at least occasionally." *Trepanier v. Comm'r of Soc. Sec. Admin.*, 752 F. App'x 75, 79 (2d Cir. 2018).  Section 404.1567(c) defines "medium work" as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds."  20 C.F.R. § 404.1567(c).  A person who can do "'medium work' can also do sedentary and light work."  20 C.F.R. § 404.1567(c).  The weight restriction for "light work" is "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[17]  20 C.F.R. § 404.1567(b).

The Court concludes the ALJ did not err when he assigned a "medium work" restriction, because he further limited the plaintiff to lifting no more than twenty pounds frequently.  Here, the State agency medical consultants concluded that the plaintiff could lift 50 pounds occasionally and

---

[17] The complete definition of "light work" is as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

twenty pounds frequently. (*See* Tr. 90, 102). For the "occasional" lifting restriction, the plaintiff's ability to lift 50 pounds matches with the "medium work" definition, not the "light work" definition. For "frequent" lifting restriction, the plaintiff's ability to lift twenty pounds meant she could lift double the "light work" restriction but fell shy of the "medium work" 25-pound requirement by just five pounds. Accordingly, the ALJ's assignment of "medium work" *with* an additional twenty-pound limitation was closer to the State agency medical consultants' assessment than a "light work" restriction. (*See id.*).

Indeed, it is not uncommon for ALJs to add a weight lifting restriction to further characterize a medium or light work restriction in the RFC and for courts to affirm such a limitation. *See, e.g., Saez v. Saul*, No. 3:18-cv-2061 (SRU), 2020 WL 252770, at *8 (D. Conn. May 20, 2020) (affirming appeal where RFC included "medium work" with a restriction of "lifting 40 pounds occasionally and 20 pounds frequently," in relevant part because the jobs available in the national economy accommodated the restriction); *Dfiglia v. Comm'r of Soc. Sec. Admin.*, No. 22-CV-6825 (KAM), 2024 WL 1332502, at *4 (E.D.N.Y. Mar. 28, 2024) (concluding the ALJ did not err in RFC determination, where one limitation was "lifting, carrying, pushing and pulling up to 50 pounds occasionally and 20 pounds frequently"). *C.f. Trepanier*, 752 F. App'x at 79 (finding the ALJ erred by assigning "medium work" where medical provider only commented on the plaintiff's ability to lift 30 pounds *frequently*, but concluding the error was harmless as the evidence established he could occasionally lift 50 pounds).

Even if the ALJ's "medium work" restriction with an additional twenty-pound frequent weight limitation did constitute procedural error, however, the overwhelming evidence leads the Court to conclude that such an error was harmless. To summarize the record, the plaintiff visited

her rheumatologist once in July 2019, four times in 2020, twice in 2021, and once in January 2022.[18]  She also sought treatment from her primary care provider periodically.

The Court begins with the plaintiff's rheumatology appointment on July 18, 2019.  (*See* Tr. 21, 547).  She reported that she was "stable over the last few months" and that 60 mg of Cymbalta was "working well to control her symptoms."  (Tr. 547).  The plaintiff experienced "significant muscle spasms" on a "rare basis," reporting that "her pain is generally well managed and she has not had any recurrent severe flares of discomfort."  (*Id.*).  She was recommended to return in six months.  (*Id.*)

When she returned in January 2020, she decided with her physician to reduce her Cymbalta dose to 30 mg.  (Tr. 546).  The physician recommended a follow-up appointment in two months.  (*Id.*).  At the follow-up appointment on March 30, 2020, the plaintiff reported breakthrough symptoms soon after she decreased her medication dose and that she increased her medication on her own "without any side effects."  (Tr. 531).  The rheumatologist noted that the plaintiff possessed additional medication "to help settle her overall pain and discomfort" when symptomatic, but she "rarely" used it.  (*Id.*).  The rheumatologist spent twelve minutes with the plaintiff and recommended a follow-up visit in four months.  (*Id.*).

In May 2020, the plaintiff visited her rheumatologist again for a seventeen-minute appointment.  (Tr. 529).  Her mother had recently been diagnosed with metastatic cancer, and the stress was "aggravating her overall pain."  (*Id.*).  Still, the rheumatologist prescribed her as-needed medication but did not conclude long-term medication changes were necessary.  (*Id.*).

---

[18] The Court notes July 2019 pre-dates the onset date and evidence after September 30, 2021 post-dates the substantial gainful activity date.

The plaintiff returned to her rheumatologist in August 2020.[19]  (Doc. No. 18-1 at 5 (¶ 13); Tr. 527).  The record shows she complained of increased pain and achiness in her hands, achiness in her hands and wrists, and thinning hair.  (*Id.*).  The rheumatologist also noted that "[w]hen she forgets her medications, her pain becomes more pronounced," that "compression/arthritic gloves" are beneficial, and that her hair loss is attributable to stress.  (*Id.*).  However, in evaluating the increased symptoms the rheumatologist concluded "that most likely this is related to understandable stress from the death of her mother as well as some inconsistency with taking her Cymbalta on a regular basis."  (Tr. 527–28).  Her provider recommended a "regular follow[-]up exam in three to four months' time."  (Tr. 528).  Given the situational stress and inconsistent medication usage, the Court cannot conclude that this incident of worsened symptoms is sufficient, standing alone, to establish that the ALJ's assessment of her physical impairment constitutes reversible error.

Three months later, in November 2020, the plaintiff informed her primary care provider that she was not feeling well and had "sensitivity to smell, increased headaches and fatigue."[20] (Tr. 954).  However, the record evidence indicates these symptoms arose after she returned home, which she attributed to her neighbors smoking cigarettes.  (*Id.*).  The plaintiff also indicated her medication gave her relief.  (Tr. 954–55).  With respect to more severe symptoms, she denied fever, "body aches out of the norm," and changes in smell.  (Tr. 954).  In the Statement of Facts,

---

[19] The plaintiff cited four medical appointments in her brief as examples of her "higher level of physical impairment than the ALJ determined."  (Doc. No. 18-1 at 24).  This August 2020 appointment is the first example.

[20] This visit marks the plaintiff's second example of her professed "higher level of physical impairment than the ALJ determined."  (Doc. No. 18-1 at 24).

the plaintiff conceded her symptoms were "controlled on her current medications." (Doc. No. 18-1 at 6 (¶ 15)).

The plaintiff did not visit her rheumatologist again until April 2021.[21] (Doc. No. 18-1 at 7 (¶ 23)). Though she now argues that she suffered from "up and down symptoms" in April 2021, including stiffness, soreness and pain, (Tr. 985), she fails to acknowledge other evidence from this particular rheumatology appointment that showed her symptoms were well-managed. In particular, her medication had a "positive impact on overall pain and discomfort," her provider discussed "conservative treatment" (weight loss, exercise, dietary changes) with her, they decided not to change her medication, and she did not need to return to her rheumatologist for four months. (Tr. 985).

On May 14, 2021, the plaintiff visited her rheumatologist for the last appointment before resuming substantial gainful activity.[22] (Doc. No. 18-1 at 8–9 (¶ 27)). She described fibromyalgia-related pain to her rheumatologist as "hand discomfort with overuse," "nerve-like pain in her legs when climbing up stairs," difficulty catching her breath "when she gets to the top of stairs," and "episodes of rib and epigastric discomfort, which is worse with anxiety. . . ." (Tr. 1215). Yet the plaintiff fails to acknowledge that the provider continued "conservative treatment," did not change her medication, and concluded she did not need to return for four to six months. (*Compare* Doc. No. 18-1 at 24 *to* Tr. 1215–16). Several days later, the plaintiff complained to her primary care doctor about anxiety manifesting in physical pain, swollen ankles, and stomach pain. (Doc. No. 18-1 at 9 (¶¶ 29–30)). The provider attributed these symptoms to stress. (*Id.*).

---

[21] This visit marks the third example of her professed "higher level of physical impairment than the ALJ determined." (Doc. No. 18-1 at 24).

[22] This visit marks the fourth and final example of her professed "higher level of physical impairment than the ALJ determined." (Doc. No. 18-1 at 24).

On January 14, 2022, the plaintiff returned to her rheumatologist. (Tr. 1217). At this point, the plaintiff had been engaging in substantial gainful activity for over two months. She indicated that driving caused her "some right foot pain;" that she also had increased left foot pain; and that she also had "achiness" in her left lower back, knees, toes, left elbow, wrist, and shoulders. (*Id.*). While heat helped the symptoms, she also had difficulty sleeping. (*Id.*). Her rheumatologist prescribed prednisone and scheduled a follow-up in six months. (*Id.*).

The ALJ also assessed the plaintiff's complaints about physical pain in March 2022 and thereafter. (Tr. 21). These instances were connected with a motor vehicle accident, not fibromyalgia. (Tr. 21; Doc. No. 18-1 at 15–16 (¶¶ 59–64)).

As the record indicates, the plaintiff's severe impairments were generally managed through the proper titration of medication and therapy. (Tr. 540–47, 1215–16, 1219). When the plaintiff took medication consistently, she generally responded well. (*See, e.g.,* Tr. 540, 949, 985). It is well-established that chronic conditions such as fibromyalgia are subject to cycles of improvement and, at their worst, debilitation. *See Estrella v. Berryhill*, 925 F.3d 90, 97 (2d Cir. 2019). Here, despite some "ups and downs" with her chronic pain, the medical evidence does not suggest or support more severe limitations than those listed by the ALJ in the RFC: (1) a twenty-pound limit for frequent lifting; (2) no more than six hours of standing, walking or sitting; and (3) simple and repetitive tasks with only occasional changes in the routine. (Tr. 19–20). Indeed, the plaintiff's most severe symptoms were from January 14, 2022, during which she was able to sustain substantial gainful activity. (Tr. 1217). The Court concludes that the ALJ properly considered the full range of the plaintiff's exertional limitations in determining her RFC.

Moreover, the ALJ's "medium work" assignment had little bearing on the plaintiff's disability determination. After evaluating the vocational expert's testimony, the ALJ determined

that the plaintiff could perform a significant number of jobs in the national economy: marker, router, assembler of small products, surveillance system monitor, usher, photofinishing counter clerk, and furniture rental consultant.  (Tr. 24–25).  All of these jobs are classified as either "light work" or "sedentary work," which means the plaintiff would only be required to frequently lift ten pounds or less.  Therefore, to the extent there is any error in the ALJ's inclusion of a "medium work" restriction in the RFC, it was clearly harmless.

**B.**    **Substantial Evidence Regarding the ALJ's Residual Functional Capacity Determination**

In the alternative, the plaintiff argues that the ALJ's RFC determination was not supported by substantial evidence.  To support her position, she contends that the ALJ should have given her a light exertion restriction and further limited her handling ability.  (Doc. No. 18-1 at 25).  She also states that she required more "off task" behavior than the ALJ allotted.  (*Id.* at 26).

The defendant maintains that substantial evidence supports the ALJ's RFC determination.  (Doc. No. 24-1 at 9–12).  First, the defendant posits that the plaintiff has not presented enough evidence to support the limitations for which she advocates.  (*Id.* at 10).  Second, the defendant states that the plaintiff misconstrues the "substantial evidence" analysis: the question is whether the *ALJ's determination* is supported by "substantial evidence," not whether *her position* is supported by "substantial evidence."  (*Id.* at 10–11).  Third, the defendant points out that there are no medical source opinions supporting the limitations suggested by the plaintiff.  (*Id.* at 11).  Fourth, the defendant notes that, "even if the ALJ had imposed additional functional limitations in the RFC, Plaintiff would still be able to perform work that . . . exist[s] in significant numbers in the national economy."  (*Id.* at 11–12).

The Court has already reviewed the plaintiff's "light work" argument and found it unpersuasive.  It will not readdress that argument here.

As for the plaintiff's argument that she was entitled to an additional handling limitation, the Court finds that "substantial evidence" supports the ALJ's determination.  The plaintiff cites to a rheumatology appointment on May 14, 2021—her only citation to evidence during the relevant period—which indicates that she had "hand discomfort with overuse." (Doc. No. 18-1 at 25 (citing Tr. 1215)).  While the plaintiff had a history of carpal tunnel syndrome pre-onset, (*see, e.g.,* Tr. 533), during the relevant period, the plaintiff did not specifically complain about hand and wrist pain to her rheumatologist until August 2020.  (Tr. 527).  Apart from imaging in December 2020, (Tr. 1017), the record shows she did not receive treatment specific to her hand and wrist, and her rheumatologist managed generalized pain through medication.  It was not until July 19, 2021, that the plaintiff again sought treatment for hand and wrist pain.  (Tr. 1171).  Shortly after obtaining substantial gainful activity, she received carpal tunnel syndrome surgery.  (Tr. 1855 (indicating surgery on October 8, 2021)).  Though the medical evidence does not indicate whether the surgery resolved the pain, the ALJ determined, and the plaintiff has not challenged, that her carpal tunnel syndrome was not a severe impairment.  (Tr. 17).  Furthermore, to the extent the plaintiff testified that hand pain caused her to drop household items and take breaks while cooking, (*see* Tr. 46–48), the medical records lack these same complaints.  The Court concludes that a "reasonable mind might accept as adequate" the ALJ's decision *not* to add a handling limitation, because there are only two isolated periods over the course of several years in which the plaintiff complained about hand and wrist pain.  *Richardson*, 402 U.S. at 400.

Turning to the plaintiff's "off task" argument, the Court finds it unpersuasive.  The standard of review requires the court to "determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision. . . ."  *Rubin*, 116 F.4th at 154–55.  The plaintiff requests the Court remand the case "so that the ALJ can compose an RFC description that

encompasses [the plaintiff's] actual limitations, as they have been described in the record." (Doc. No. 18-1 at 26). Rather than addressing "the record as a whole," the plaintiff generally summarizes her testimony that she needed to stretch "like five minutes tops" every twenty to 30 minutes while working and cites to records from one primary care visit when she complained of anxiety in public places. (Doc. No. 18-1 at 26 (citing Tr. 45–46, 49–50)). "If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld." *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014); *see Schillo v. Kijakazi*, 31 F.4th at 74 (same). The ALJ's RFC requires "normal breaks" from standing, walking, and sitting; simple and repetitive tasks or instructions; and only occasional changes in a routine. (Tr. 19–20). A "rational interpretation" of the plaintiff's cited evidence, and the record as a whole, is that the ALJ's RFC accommodates her limitations. *McIntyre*, 758 F.3d at 149.

Moreover, the record does not contain any medical opinion evidence about the amount of time the plaintiff needs to be off task. Instead, the State agency consultants focused on the *type* of tasks she could perform, i.e., those that were simple and/or routine. (*See* Tr. 90, 92, 101, 102, 104). To the extent the plaintiff believes "[t]he ALJ should rely on the medical opinions in the record," the Court has already explained that he incorporated the State agency consultants' opinions about the plaintiff's limitations into his RFC, *supra* at 23, 30. The Court will not rehash the issue here.

Lastly, the plaintiff has failed to inform the Court what functional limitations she believes were omitted from the RFC. Without doing so, the Court cannot evaluate the vocational expert's testimony. The vocational expert testified that jobs would not be available in the national economy for an individual in the plaintiff's position who needed to be off-task twenty percent of the workday. (Tr. 76). But the plaintiff does not argue she needs to be off task for twenty percent of

the day.  In nearly every hypothetical, the vocational expert testified that jobs would be available in the national economy.  In other words, the vocational expert's general testimony indicates an RFC with additional restrictions could still allow the plaintiff to work in the national economy. (Tr. 64–74).  Thus, the plaintiff fails to establish remand is warranted.

## VI.    <u>CONCLUSION</u>

The plaintiff's motion for an order reversing or remanding the Commissioner's decision (Doc. No. 18) is **DENIED** and the Commissioner's motion to affirm that decision (Doc. No. 24) is **GRANTED**.  The Clerk is directed to enter judgment in favor of the Commissioner and close this case.

This is not a Recommended Ruling.  The consent of the parties permits this Magistrate Judge to direct the entry of a judgment of the District Court in accordance with the Federal Rules of Civil Procedure.  Appeals from this judgment can be made directly to the appropriate United States Court of Appeals. *See* 28 U.S.C. § 636(c)(3); Fed. R. Civ. P. 73(c).

It is so ordered this 26th of March 2025, at New Haven, Connecticut.

　　　　　　　　　　　　　　　　　　  /s Robert M. Spector_____
　　　　　　　　　　　　　　　　　　Robert M. Spector,
　　　　　　　　　　　　　　　　　　United States Magistrate Judge